All right, Mr. Rosencrantz, you may proceed. Thank you, Your Honors. May it please the Court, my name is Josh Rosencrantz, representing Apple. Your Honors, viewed through the lens of the patents in this case, Apple's and Motorola occupy completely opposite ends of the spectrum. Apple's patents cover distinctive features that are embodied in consumer products that have revolutionized those particular products, those markets. Because Apple's business model is all about exclusivity, Apple will not, as a general matter, license these inventions, certainly not to competitors and never for money. By contrast, by Motorola's own account, its patents, in this case, are about standard features and they became standard because Motorola was prepared to license universally to everyone and made a binding commitment. I'd like to spend my limited time this morning focusing on how those two polar opposite ends of the spectrum play out with respect to two sets of issues on relief, first injunction and then damages. And if time permits, I would very much like to get to the question of claim construction on the 949 patent because it overlays on top of damages. So let me start with injunction. Now, Apple presented a classic case for injunctive relief. It has a policy against licensing. It has never licensed these inventions. And how does that relate to the four-factor test in eBay? Because that's what we need to analyze the injunction issue in both cases of the Motorola. Yes, Your Honor. It goes directly to irreparable harm. So under active video and extensive practice of licensing, as a matter of law, this court concluded in that case would not satisfy the eBay factor of irreparable harm and adequacy of monetary damages. This is active video on steroids. I mean... Wait, you're saying, you're talking about Motorola. I'm sorry, I'm sorry. With respect to ours, the exclusivity point is, under this court's opinion in Douglas Dynamics, is controlling. We are exclusive. We do not license these. So your view of the law is exclusivity, which is the right of the patent holder and the right to exclude. If you can show a history of non-licensing, that satisfies automatically the irreparable harm factor under eBay? No, Your Honor. So yes, it's exclusivity under Douglas Dynamics and a practice, a general policy of not licensing to competitors. And you think that's sufficient? It by itself is sufficient to preclude an injunction? Not in every case, Your Honor, but certainly in this case where they are central features of the consumer product. But in Douglas Dynamics, that was really mainly what this court pointed to. In Bosch, also, this court ordered an injunction as a matter of law. But I did get ahead of myself because I did want to talk about... Your answer to Judge Posner, does that really apply where the patented feature is just a minor component of a device, let's say, that has many patented features? I would say yes. That was certainly the case in Broadcom. That was the case in Bosch and in Douglas Dynamics. Does Judge Posner often characterize these as minor features? On what basis? Your Honor, it was mainly on the basis of severely limited claim constructions, which were just plain wrong. The 949, which I mentioned I'd like to get to a little bit later, just limited the patent to one basic gesture when the patent covered many more. Instead of minor, then, what if I say a single feature in a device that has many features? Your Honor, that has always been enough, at least in the permanent injunction context. This court has always said that when there is a feature in... It's always been willing to award an injunction in a case. When there has been a feature, the feature has been infringing, and the act of infringement is the sale of the product, and the sale of the product has affected market share or resulted in loss of sales. I was saying I'd like to turn to the Motorola side of the balance, because that represents the opposite... There was also another kind of conclusory statement of Judge Posner. He said it's easy to design around these features. Is there any basis for that in the record? There is no basis in the record for that, Your Honor. Certainly, it's an argument that could be hashed out in a trial. Judge Posner's... But this is summary judgment. Is that correct? The main error Judge Posner made was to make a predictive judgment as to how he, as a fact finder, would rule at the summary judgment stage without waiting to hear the actual evidence. Even though the judge himself is going to be the fact finder, we are entitled to a trial for the judge to actually hear the evidence. He said it was likely to be easy to design around, but that was based upon his predictive judgment. In fact, on summary judgments, you've got to assume exactly the opposite facts rather than conclude that it's minor features easy to design around with no market harm. You have to assume the other, right? Agreed, Your Honor. Absolutely. That was the key mistake he made. Let me get to the other side of the spectrum. I began answering Judge Prost's question about that. Now, Motorola made an enforceable commitment to license universally to the entire world, including Apple. Motorola's whole theory here is that these features are standard, so they couldn't be driving the demand for any Motorola product. Judge Posner at least referred to no injunction, maybe because he was afraid to get to a hard and fast rule. My understanding is he says no injunction under those circumstances, a willingness to on the other side. Is that your takeaway from what he was saying? And if so, is that your position? Do you agree with that, that there should be an exception to the non-injunction issue here? Your Honor, I wouldn't put it quite as starkly as that, and Judge Posner in other parts of his opinion did not put it that starkly. I grant you that he did say that. What I'm saying is on these facts, an injunction could not lie. Now, these facts are similar to a lot of other situations where you have standard, essential... But if that's his rule, was there an inquiry then as to Apple's willingness to pay a friend royalty? I mean, that's what the other side is saying, right? I mean, if that's the standard we are adopting, if we embrace what Judge Posner said, shouldn't  And that brings me to the real question, the elephant in the room is, when do you measure the willingness? So, Your Honor, my answer is this whole notion of an unwilling licensee is a very mischievous notion. I don't know where it came from. Never in the cases of this court, the Supreme Court, or so far as I know, any district court, has anyone sustained a claim for inadequacy of monetary damages on the ground that someone, that the defendants took an unreasonable position in licensing. What a morass that would be if in every patent case, they almost always start with a demand, a turning down of the demand. The patentee then says, that's unreasonable, I'm going to sue you. At what point does it become willing or unwilling because they're always a protracted, difficult negotiation? Right, and so... It could have met when the judge settles on, I mean, if there's a dispute between the parties and the amount, so once the judge settles, which is kind of hard to see, you know, this is in the midst of the trial, I guess. When the judge settles on a reasonable royalty, then he asks Apple, are you willing to pay? Is that the willingness? I'm quite sure that... I have a concern with that, too. I mean, maybe it's not as serious as the concerns you raised with regard to the whole negotiation process, but doesn't that present a little bit of a problem as well? I don't think it does. I mean, it is very routine for the accused infringer to say, your royalty is too high, if you really believe you deserve that, sue me. But isn't a normal case, a non-Fran case, you're asking us to, at the get-go, make a determination that there's no irreparable harm because they've been expressed a willingness to license. So isn't there some... In a normal patent case, if there's a finding of no irreparable harm and the alleged infringer is unwilling to pay the royalty, the answer is contempt. Yes. It's not, we're going to give you an injunction. It's the normal contempt proceeding. So why should this be different? I don't think it should be different. The rules that apply to Apple as a defendant are the same as the rules that apply to any defendant. When you're going into negotiation history, when you're figuring out whether prospective injunctive relief is good enough, you shouldn't be doing that here. And so to answer the question, you started with Judge Posner directly, the unwilling licensee that I think Judge Posner had in mind was a licensee who at the end of adjudication, after having been adjudged to be infringing a valid and enforceable patent, says, I won't pay that royalty, hikes assets, or is impecunious and cannot pay that royalty. Did we ever get to that stage? No, we never got to that stage. Could we have gotten to that stage on summary judgment in any event? We couldn't. If I'm understanding your question correctly... It requires an awful lot of facts, doesn't it? It does not, Your Honor. It requires a knowledge of whether Apple is taking the position that it wouldn't pay any judgment. Now, bear in mind, this is a strange case, because at the point at which Judge Posner decided this case, damages had already been, this is the injunction issue anyway, damages had already been out of the case. So this was only an injunction case when he had decided this, but injunctive relief is something you can dismiss on summary judgment if it wouldn't be justified by the facts, and it absolutely wouldn't be justified by the facts here, because there's no indication Apple would ever have defied a court order. But I think, I don't know if this is Judge Rader's question, but at least it prompts my question, which is, but doesn't that require then, if the standard is an unwillingness, doesn't the judge, in order to enter summary judgment, have to, as a predicate for summary judgment, make a determination with regard to willfulness? And if that's the case, did Judge Posner do that in this case? Well, the answer is he didn't do it in this case, because it was not necessary to do in this case, because there were no facts on this record that would ever suggest that Apple would defy a court-ordered royalty, would hide assets, that Apple has never done that. So you're saying that he, through his silence, made that determination, that no, on this record, sufficient basis, there's no allegation of an unwillingness. I don't know what Judge Posner had in his mind as the unwilling licensee, but I do believe that is what he concluded, and it's true. I mean, there are no facts on this record that would ever justify grantee-injunctive royalty. But if what you said earlier, if I understood it correctly, it was that the inquiry with regard to unwillingness or willingness takes place once the judge has made a determination with regard to the reasonable royalty. That didn't happen here as a predicate. Right, because in this case, there would be no royalty if we were correct about damages. So there was no reason to entertain that. But even in a world where you can imagine, let's say the court reverses on damages, even in a world where you can imagine that a royalty would be ordered, on the record in this case, the notion that Apple would ever defy a court order so injunctive relief would be, so the monetary damages would not be enough, is far-fetched. There's nothing on this record to suggest it. Now, I do want to reserve time for rebuttal, but I do want to very much get to the 949 if that's possible. Don't worry about time. I'll worry about time. Okay. I'll stop you when we've had enough. All right. So if there are other questions on the remedies, I'd be happy to address them. Well, just address briefly the full dismissal of all damages experts. Oh, yes. I'm sorry. I'm sorry. I did want to get to damages. So on damages to Motorola and Apple. I've had the occasion to participate in and observe proceedings in which damages experts are excluded, but I've never seen that result in the absolute finding that there will be no damages. I agree with you, Your Honor. That kind of runs a little contrary to the statute that says, in any event, you get royalty. But please, proceed. So what Judge Posner did with respect to Apple's damages, I agree, is very stark. Apple's expert came in. He had a benchmark. It wasn't perfect. No benchmarks are perfect, but it was reasonable. But in stark contrast, Motorola's expert came in with an astronomical figure, several hundred million dollars, for a single patent that the district court's own neutral expert said was so obvious that it added nothing at all to the prior art. The only way to bloat the damages calculation in that case for Motorola was to make foundational errors, and the district court was right on identifying the foundational errors. Let me start with the most obvious one. Motorola's expert took the rate that Motorola charges for an entire portfolio of hundreds of patents, and said that for one patent, Motorola would demand that Apple would pay 40 to 50%. Now, can I ask, we're talking about the 898, right? That's what was left in the case, but the expert did the same thing about the 898 and the 559. As a special matter, do you understand Judge Posner could have said, had decided to throw this out because what they said was incorrect? Or was it simply that what they said was insufficient? It's not that that's absolutely positively inadmissible evidence in any circumstance. I read it a little bit more narrowly, so I'd like to know if you agree that what he was saying was that and only that makes it not necessarily in and of itself inadmissible, but insufficient to satisfy the criteria for damages. Your Honor, he seemed to say in the 898 a little bit of both. What is your position? Our position, it is both. It is both inadmissible. If the expert opinion is going to be on what these patents are worth, which is what it's supposed to be, you don't start with a rule of thumb, as this court said in Unilock, throwing out the 25% rule. Now, all that this expert did was to take the 25% rule and double down on it. There was absolutely no basis on which to believe that Motorola would ever extract that kind of royalty for one patent. Motorola had never done it. No one in this industry had ever done it. And so far as it appears from the record... What about Donahoe's point that, well, the first to arrive on the scene is going to get a bigger share of the pie? So Donahoe based that on nothing. He said that's what Motorola... Experience. Don't we allow experts to testify based on their experience? We do allow them to testify based on their experience, but when he was providing the basis for his experience, he concedes that he didn't look at these particular patents. He concedes that Motorola had never actually done this. In this case, Donahoe was Samsung. Samsung had never done it. The only piece of evidence in this record about anyone using a royalty base like that was IBM from the 80s and 90s, which never applied a 40% royalty anyway to a single patent. So the most Donahoe supports is that it could be nonlinear, disproportionate, but not that one patent... And you're not suggesting that that in and of itself is absolutely unacceptable? No, I believe it's right. A more valuable patent could garner more. We assume that Motorola is picking a patent that is more valuable to lead with, but not worth... If we're talking about a portfolio of 500 patents, not worth 250 of them, particularly in a world where the patent portfolio rate did not go up when these two patents... What about in respect to Apple's damages in this evidence? Is it reliable to compare a track pad or a mouse to the value of the 949 claims? It is, Your Honor. I mean, what our expert did... It seems like what you're arguing should apply to Motorola should apply to you as well. We accept the same standards, Your Honor, but what this expert did was to take a commercial benchmark that had a lot of the same features. It was about controlling with your fingers rather than using a mechanical mouse or a keyboard. Very, very similar features, but he didn't just take it one for one. He abstracted it down by 50% to account for the general ability to maneuver around. He abstracted it down another 75% to account for the fact that these were fewer features in the 949 patent than there were in the magic track pad. That's exactly what experts do when they use benchmarks. He didn't use a rule of thumb, 40% to 50%, regardless of what the patents are, before me. Now, every Motorola expert in this case testified and acknowledged that they were not looking at the individual. By definition, in defining a market, you look at comparables. Absolutely. It doesn't matter whether it's real estate or software, right? We always do, and that's what he did. It wasn't perfect, but the imperfections he accounted for and any remaining imperfections were enough for a jury. What Judge Posner found here, just like if we're looking at comparables, there are some transactions that are not comparables. They're not reliable for whatever reason. It's a different environment, or it's surrounded by water. Right, so we're talking now about Apple's patent? Yes. But they are comparable. I mean, we're never going to get the same exact comparable for the touchscreen, because we don't license the touchscreen. We will never have a royalty that you can compare to that, but he did what experts do all the time, what this court accepted in eye for eye, which was to come up with benchmarks. Can I just ask you a completely hypothetical question, just because it's just a housekeeping thing, which is, if we were to disagree with you hypothetically on the expert on Apple's on the 9-4, is it 9-4-9? Yes, sir. Does that do away with then all of the claim, I know you've got a serious claim construction dispute with what Judge Posner did on the heuristic. Does that, if we were to agree with him on the damages, does that get rid of the whole claim construction dispute, or is there a reason that we would have to reach that issue? The court would have to reach it because Judge Posner's analysis depended intimately on the ease with which one could design around the triviality of that particular touch, and so that claim construction was wrong, as I'll get to, I hope, eventually, to limit that entire claim. Depends how generous Judge Ray is. But it depended intimately on that, and the 6-4-7 depended intimately on a claim construction as well, and so the court needs to address the claim constructions in order to figure out whether Judge Posner was wrong. Let's go on there. To the 9-4-9? Yes. Thank you, Your Honor. Heuristics. And before I do, I'll just mention, even apart from apportionment, there's also a blatant violation of the entire market value rule, and there's a complete failure to account for what's called the holdup value, the value not of the patent itself and what it contributed inventively, but to the value that the patent acquired by becoming part of a standard. Wait, so you're no longer talking, you've gone off the 9-4-9, and now you're talking about the holdup value rule? Just a last thought on damages. And just one other thought on the kind of the correlations here. Brian Knapper's expert report was all issued before the narrow claim construction ruling, right? It was, yes, Your Honor. So that he didn't really have a chance to adjust that. It was faulted for not anticipating the expert, for not anticipating a claim construction, which you're now going to talk about. Yes, correct, correct. And just to be clear, we requested an opportunity to let him revise his report in light of the erroneous claim construction. By the way, the district judge I know who excluded an expert allowed that opportunity to revise. Please proceed. I have a question that relates to something that Judge Rader had asked before, and I'm not sure that I gave her an answer. But in this case, Judge Posner excluded the damages evidence on both sides, and then threw out the cases. In a situation like that, should there not have been some sort of finding of nominal damages under the law, or especially the AIA? Well, Judge Posner did address that, if I recall correctly, and concluded that there's no requirement that he go through an entire trial on infringement just to award $1 in damages, if I'm understanding the question correctly. And do you agree with that? We didn't raise that on appeal. I don't agree with that. I mean, we are entitled to a ruling on damages, excuse me, a ruling on infringement. Assuming we find that he was correct in excluding the evidence, and you're saying it was okay that he threw out the cases because there was nothing left. No, no, I'm saying I disagree. But you're also saying you didn't raise that on appeal. We did not raise that on appeal. Let's go on to the heuristics. So, Your Honor, just a few brief words about the 949 claim construction. Claim 1 has none of the trappings of a means plus function claim. The drafters opted not to say means of, which means it's presumptively not means plus function. I lived through the 90s when we developed all this law, and we made it very clear, didn't we, that if you don't say means, you don't mean means. That is absolutely clear. There's a presumption. It can be overturned. You said it was a strong presumption. Strong, indeed. Yes, Your Honor. So a strong presumption. Now, what evidence is there that this strong presumption was rebutted? There's no evidence, Your Honor. This claim is full of structure. You can look at the first nine claims that are imported into the first nine limitations that are imported into that final limitation. It's full of the sorts of structure that this court said was sufficient in Inventio and LG Electronics. And what Judge Posner did was to say that there's a special rule for computer programs. When you've got a computer-enabled claim, you need to provide in the claim itself an algorithm or a step-by-step process. That is just wrong under this court's precedence. But in fairness to Judge Posner, what he said, you're right, there's structure in the claims. But he differentiated between structure and structure. And he said, yeah, you've got structure on which the function is going to be performed, i.e., the phone. But not the structure he was looking for was to perform the function of whether to display a next item. So just in fairness, right? I mean, that was the distinction he drew. So maybe you want to respond to why that distinction was not valid. Well, so I think that's not the distinction he drew. I mean, his basic premise here was that when you have a computer-enabled program, you have to describe structure within the claim itself. That is what he said. And that's just wrong under LG Electronics and Inventio. But let me answer Your Honor's question. That is the right way to analyze means plus function. There is ample structure in this invention. So I'm looking at the first page of our addendum because we've numbered the various limitations. But you could do it without doing that. So it's a next item heuristic for determining. For determining what? For determining what finger contacts mean. This is at the very end, limitation 12. And what finger contacts mean to do what? To go to the next item. How do you do it? You do it on a touchscreen. How does the touchscreen register the data that makes the inference? Through a computer that has a series of requirements. A processor, a memory, it has programs. The programs have to satisfy five claim limitations. That is way more than this court found to be sufficient in LG Electronics and Inventio. Cases that my colleagues haven't even addressed in their brief. And so my challenge to them is explain to this court how this can possibly be sustained without overruling Inventio and LG Electronics. All right. Thank you, Mr. Rosenkranz. Thank you, Your Honor. I've just decided time's up. Now, just a second. I need to do some calculation. I need you to add 18 minutes to Mr. Nelson's 12, which will give him 30. And that preserves both rebuttal times, and you can proceed. Thank you, Your Honor. Keeps the time relatively even. If you need to use that time, it's yours. May it please the court, Dave Nelson on behalf of Monroe. I'd like to start where we finished with the 949 construction first. I think in order to understand this construction, it's just like you do any construction. You need to understand what the patent describes to be the invention. Where does it say means in the claim? It doesn't say means in the claim. Then why are we in a means plus function claim, particularly in something that is more than software? It's touching. It's all that's involved in this invention. Well, that's why we need to go back to the way the patent explains the invention. What it says is there are touchscreens out there. There are touch devices out there. There are things that are operated that way. But the problem with these is that they don't translate imprecise gestures, imprecise finger gestures very well. So in other words, you've got to be able to discern one from another, and I think the language the patent uses is to say, translate that into specific commands. So the structure that you find at the beginning of the claim, and this goes to Your Honor's point about Judge Posner, that is what these instructions are being performed upon. So in other words, it is no different than in many of this court's means plus function cases, granted. But this isn't a means plus function case. It is not, Your Honor. It is not. Well, he said it was. Does that error alone send it back? No. I thought your question was, does the claim say means for, and it does not. It does not. And we've said in several cases, Inventio, Lighting World, but I think it was said in at least five in advance of those, that there's a strong presumption that you don't have a means plus function claim unless you say means. Agreed. But think about the way the patent describes the invention. So we already had touchscreen devices out there. We already had things that translated finger. So you have to distinguish over them, and that, of course, is what the whole patent is about. Right, and we have to interpret the claims in light of that. So the elements that we're talking about are the heuristic elements. Now heuristics itself is simply instructions. Instructions or rules for operating on data. But that's what a computer program is. That's what any computer program is. It operates on data. So you haven't told me anything about the structure. You haven't told me anything about how you are, in the claims, how you are taking those imprecise gestures. Are you arguing this is not enabled? No, not at this point. In other words, a person of skill in the art does know how to do this. Well, but that's separate and apart from how you… Based on what is disclosed in the patent specification. Right, but we have to go back to the patent specification. They know certain ways that the patent specification discloses for achieving the functions that are described. Particularly in the environment here. Because remember, what claim one is about is distinguishing three separate events. Meaning, I have a gesture, and that's interpreted to be locked into the vertical. I have a gesture, you know, that's made by a finger, and that's determined to be two-dimensional translation. And the third thing is that I have a gesture by a finger, and that's determined to be the next item. So, the patent, there's only one of the embodiments. This patent goes on for 363 pages. There's only one of the embodiments that's described there that talks about how to distinguish those three gestures. Which is what the district court here relied upon in the claim construction. That's figure 39 and the surrounding text for figure 39. So, without resort to the specification, then no one of already skill in the art would know what it is that you're talking about for distinguishing the gestures, this finger gesture, into one of those three commands. So, if you don't interpret these claims, that are claimed, the heuristic elements, as purely functional, in means plus function, what you've allowed in the software case is for somebody to say, I have claimed every way, any way that you can think of, for performing these particular functions. Now, your honor, the reason why I think this is... I don't think that is absolutely correct, is it? If I improve upon the way that is done in this patent, as disclosed in this patent, I will get an improvement patent. I have not, this does not purport to claim every single way of performing a function. Of these particular functions here, that's the way Apples interpret those. Anyway, in other words, these heuristic elements, under Apples claim construction, are purely functional. I don't think there's any dispute there. So, I'm focusing on the heuristic elements themselves. So, necessarily, if you have heuristic rules for operating on data, for performing a particular function, that claim, in fact, does, under Apples construction, claim every way of doing that. So, think about this from a policy... I don't think this court has to accept that argument, even if that's Apples' argument. If there was an improvement on the way of doing it, it would be patent eligible and patentable. Agreed if that particular patent added additional limitations, perhaps. Although, I'd have to, in that hypothetical, I'd have to see what the claims are, Your Honor, in order to answer that particular question. Exactly, but so far, you've spent six minutes telling me nothing about why this is not significant error to call something a means plus function claim when it doesn't even recite a means. Well, there are, this court's cases, there are cases where there is no means plus function. We cited the MIT versus Abacus case. There's also the Matt Hamilton case. There are several of this court's cases where there has been a determination that the claim itself, the claim element that we're talking about, is purely functional and is lacking in structure for performing the claim function, We've already agreed there's a lot of structure here. There is no structure, and I believe there's no debate on that, Your Honor, for the elements, the heuristic elements we're talking about. And that is the key, so let me just make one more point on this, and then I'll move on to the remedies. Okay, sure, go ahead. We cited some of this court's cases, the cases like the Aristocrat cases, the WMS gaming cases, and there's a policy behind those cases. Granted, those are indefiniteness cases, and they are explicitly claimed as means plus function. I'm not hiding anything there. And you're not suggesting we send it back to Judge Posner to consider the indefiniteness? I mean, are you suggesting that we decide indefiniteness here on appeal? I don't think that the record, if you were going to do that, I don't think the record is such that you could do that, Your Honor. But isn't that your argument, that if there's not a means plus function limitation, then the next heuristic, there is no limitation, and it covers all instructions, all sorts of instructions, and that Apple's claimed them all? Well, I believe that it is, at a first step, a claimed construction issue, which is why we've argued it that way. And picking up on the policy in these cases, WMS gaming and Aristocrat cases. If indefiniteness was the question, we'd, of course, have to go back for a trial that's all factual, right? You'd have to have a person of skill in the art testifying that he could perceive no bounds to this claim, which is going to be pretty hard to show when you've got this much structure. And all they have to do is come up with one additional way of doing it, and you're in trouble, aren't you? No. I don't think so. Indefiniteness, I believe, is a legal question, but I understand that there can be underlying expert testimony to get one of the orders going. We've established that you're not going to get the final word on this. I'd appreciate it if you could move on to the damages, the expert stuff. In particular, Apple's case and Mr. Knapper with regard to the 263 patent. My recollection is that's the one where Judge Posner said that he couldn't rely on this technical expert. Okay. That was part of it. Why don't you defend that? That was part of it. Yeah, I will defend that position. So the standard here, we're talking about exclusion of evidence, so it's an abuse of discretion standard under which it's reviewed. What Judge Posner looked at performing his gatekeeper function is have you, Apple, engaged in or offered testimony that would meet a minimum degree of reliability for the jury. In other words, not just throwing some number out there that's going to put something on the table without having a reliable basis for that number. But we rely on technical experts to supply the underpinning for every time we have a damages expert. Understood, Your Honor. This is credibility, not admissibility, isn't it? You can question whether Apple's Mr. Polish was neutral enough or whether he considered all the underpinning facts, but that goes to credibility, not admissibility. I don't think that's the basis. Give me another case where someone has rejected out of hand an entire proof on the basis of an expert being from one party or the other, which they always are. An expert – well, Your Honor, you couldn't simply have a rule that says if the expert's from the other side, he can't testify because they're always going to be from one side or the other. Thank you, that's the point. And they're all paid by one side. Typically, they would all be paid. So in every trial, they always point out how much are you making, and that goes to credibility, never to admissibility. What's going on here? Well, but that wasn't the basis upon which the district court made the decision. What the district court has looked at is the totality of what was being offered here. So think about this. With the 263, there was one sentence in the technical expert's report saying, well, another way you could do this is to have a separate chip, never identifying the chip. Why isn't that enough? Why isn't it enough? Because he never referred to any specific chip, never established the minimum degree that it was in this court's precedent requires that it was available, that it was on sale, that it could have been used. Then you have a credibility issue. That's not a credibility issue. That actually goes to an admissibility issue. Because in order to be able to offer, remember what Apple did here, was they affirmatively offered the cost of an alternative as their damages case. So at that point, they've taken on the burden to establish that this was an actual, viable, and commercially viable alternative. And that was where Judge Posner's complaint was with the expert. Actually, I saw that in your brief, and I couldn't find where the district court discussed your point about whether or not the selected chip was an appropriate design around. I couldn't find that in Judge Posner's opinion. I thought he didn't rely on that. Well, what he said in his opinion was you simply got one line from the expert and went and did your own research to find the chip and said, okay, here's what it would cost. He used some colloquial language in response to that. But the overall import of his decision and what he was basing that on is what actually happened. What was done here by Apple in order to try to establish… I think I may be reading it differently, though, because I thought his reliance was pretty much exclusively on the technical expert being an employee of Apple. Right, but it was what the technical expert did. The only evidence that the technical expert offered is to say you could use a separate chip. At that point, the damages expert in the testimony went off on his own, looked up an MPEG decoder, never even tried to establish whether it was on sale at the time, whether anybody bought it or whether it could be used in a cell phone, and said, here's my alternative. And there was a complete disconnect between what the technical expert offered and what the damages expert said. It seems to me that Judge Boswer made – he found it very significant that the expert was an employee of Apple and that Apple relied on its own employees. And is that a correct standard to follow? Again, I don't think that was the sole standard. I think here… He did put a lot of attention to that, didn't he? In his opinion, I agree. And he made different comparisons as to this is what Motorola could have done, and he put a lot of attention to that. And it seems to me that if we affirm on this point that we're really going to change the standard of expert evidence and expert testimony… Well, I don't think so because I think it's a factual – it would be a factual affirmance. We're talking about the abuse of discretion standard here. So under these… But wouldn't we be raising the bar? No, I don't think it raises the bar at all. It was applying the court's discretion, as they have to under Daubert, in order to decide whether this evidence that was being offered was minimally reliable. And so in terms of affirming this by the court, what you're looking at here is a situation where Apple itself said Motorola will pay what its alternative design would be, the cost of its alternative design. There's a danger if there's no homework done, which was the problem here because what you would be allowed to do in that instance is throw a number. If we don't exercise the minimum reliability, let's say the technical expert said, you know what, put a different microprocessor in there, and that's 50 bucks a unit. And then you say that's a credibility issue. You're getting big numbers in front of the jury, potentially, if you make that the rule, that you can simply rely without looking at the homework that was done. And that, I think, is the danger and would change the standard of the gatekeeper function that the district court is required to perform in this instance. What about Apple's argument with respect to its own ability to get the injunction question? I mean, there's your injunction, there's their injunction. Yes, the primary problem, and this is what the district court did, is that you have to relate whatever you're claiming to be the irreparable harm back to the infringement. That's the, I believe, if you read the district court's opinion, was the primary thing. Right, and before I forget, let me make one point. I know there was often, or there was some talk that this was a summary judgment of no injunction, and I don't, procedurally, I don't think that's quite right. If you look at the district court's opinion, it actually went out of the way. He gave us an order at the request of Apple saying, because they wanted to have an injunction hearing. And he said, he came back, and he issued an order and said, you know what, you can do it. You can have the full injunction hearing, bring whatever you want, put on whatever you want, to think you're entitled to an injunction and file whatever briefs. That was done, and we had that full hearing, which is referenced in the district court's opinion. So, I think, procedurally, it wasn't a summary judgment. There was the full hearing on the, so we are, again, looking at the district court's opinion. Did Napper get a chance to change his expert report to reflect the change in the claim construction? He, actually, on the 949, my recollection is there was a supplemental report filed after the claim construction of the 949. But what about if we don't agree with the arguments we had a few minutes ago about the 263 and the exclusion of the expert? What does that do to the whole play of the case, if we send that back on just the 263 patent? If you don't agree with respect to the 263, what does that do to the play of the case? So we are not, I mean, he shut down 263 because he excluded the expert and said there's no damages with regard to that issue. Correct. If we were to disagree with you and send it back for him to consider that evidence, does that have any play with respect to this case, the injunction, anything else? Well, no, with respect to the injunction, I don't believe so. In fact, if anything, that would counsel even further against any type of injunction. But on getting back to your honors question on the specific injunction point, the primary thing that the district court relied upon is to say, Mr. Napoli, you have not offered me evidence, anything, to connect what you're claiming to be irreparable harm, lost sales of the iPhone primarily, and price erosion, I think they mentioned. By the way, my law clerks tell me that there's nothing in the record on a supplemental report from Mr. Napoli. On the appellate record? Yes. Well, they have the record that you filed, and they find nothing on that. There was a, my recollection, your honor. We don't need recollections, we need record. Yeah, I don't have the record type for you on that particular issue. Thank you. Please proceed. So the, with respect to the injunction, was that Apple hadn't tied that back to the infringement. So let's just take the 949, for example. Apple, the only evidence that Apple offered is, well, you need to have a cool user interface. Well, what Judge Posner said is you haven't, the 949 isn't a patent for a cool user interface, right? It's for specific gestures in order to be able to distinguish one gesture over another. So you haven't offered me any evidence to establish a causal nexus between what you're alleging to be the harm, the lost sale, and the infringement. And without that, there is no evidence of irreparable harm. And this court's precedent recognizes that in numerous cases, that there has to be a connection between what you're claiming to be the harm, here the lost sale, the lost market share, and the alleged infringement. The same was true with respect to the 263. I think the only evidence offered was people like to play video. Well, again, as a district court found, the 263 patent is not a patent for playing video. And I think the only evidence cited for the 647 was the newspaper article, you know, saying that that's a cool feature. But that doesn't say that that's why people buy this. There was no consumer surveys done. There was no attempt to do any of these things. What about the 898 patent, the damages there? Is that the same argument that you're making now applied to Motorola, that there's no connection? There's nothing that shows that the value should be placed at 40% to 50% of the SAP portfolio? The difference there is what we offered, or what Motorola offered, excuse me, was real-world evidence of what was done with respect to these patents. What does Donahoe base his experience on, that the first licensor in the market gets the lion's share of the pie? Well, his experience was based on the fact that he's done these negotiations and licensed standards of censure portfolios. But I thought you were saying on these patents. That testimony was not on these patents, was it? Well, there was also, no, there was also testimony. It wasn't just expert testimony. There were testimonies from Motorola, people that would be engaged in the licensing process. Isn't it crazy to give that much value to one patent? No, actually. Particularly in a crowded field with, please, give me some reason why I, as a judge on any level of a proceeding, would give so much value to one patent. Well, the reason is because of the real-world evidence here. This is, they're licensed as a portfolio. So, in other words, when you have the standard, what people want to do is infringe on it. You have infringement of one patent in that portfolio. Understood. Understood, and that was why there was an effort to say, well, what would happen in the real world if there was a negotiation? And in the real world, if you come to me with one patent, am I going to give you 40% of the value of the entire portfolio? And what you would get in this situation in the real world is, well, in that you get the one patent. What kind of a crazy negotiator would I be to agree to that? Well, but you need the license to the other patents as well. That's what's happened in the real world. But the case is about one patent. Understood. I only need the one patent. That's all I'm coming to you and asking for a license for. Right. And we're in a hypothetical negotiation, and you're trying to tell me you're going to have, in order to get a license on this one patent, you're going to have to pay 40% of the value of 100 patents. And my answer to you is going to be, I'll see you in court, right? We're not going to agree to that. Well, and doesn't a hypothetical negotiation take us back to the point of first infringement? And if you have only infringement of one patent, how can you apply the entire portfolio? No, the entire portfolio is where the – that's where the rate comes from, right? The overall rate. That's real-world evidence. That goes back to this court's – well, this court's precedent as well as the Supreme Court precedent back to the 1800s, saying that the best evidence of what the value is is the established licensing history for those patents. And the established licensing history for this patent here is that it's licensed as part of a portfolio for a consistent value-maximal rule. So that's where that comes from. The 40% to 50% is the – applying the evidence to say now, in this case, because in the hypothetical we're only going to be talking about the one patent. Well, suppose it had been 70%. Would you argue that we should have established a value at 70% of the portfolio? If that's what the evidence – if that's what the evidence was, then yes, that's the answer to that. But remember – Well, remember that there's the FRAND obligations here. So with respect to the remaining patents in the portfolio, there would only be the 30%. Can you just clarify? Maybe I misread the record in my notes, but I thought that Donnie, you admitted that he knew nothing about the portfolio that included the 898 patent. And he was talking about portfolios of standard, essential, telecommunications patents in general, not about this portfolio. Because I think I heard you keep saying about this portfolio, and I thought that – am I wrong about that? Was he actually talking about this particular portfolio that includes the 898, or was his testimony all general? No, Donnie – Mr. Donohue's testimony was general, as you say, as to telecommunications patents. The specific answer to this portfolio came from the Motorola witnesses who were engaged and who would be engaged in these negotiations. But to answer your question, Your Honor, you would get from the remaining patents the other 30% of that. So you wouldn't be 70%, 70%, 70%, 70%. That's what would happen in the real world. And this court has recognized that type of portfolio licensing to be a positive. In the U.S. Phillips v. International Trade Commission case – now, granted, that was a patent misuse case and an antitrust case, but the principle applies. It was recognized that that actually had pro-competitive benefits. There's actually a paper, the FTC position, that cited in that that said, yes, that's the way these happen in the real world, and that's a positive, pro-competitive thing. So what you're doing with this is you're encouraging the parties to engage in what would happen in a real-world negotiation. Could you address just for a little bit, in the Fran context, the timing of the reasonable royalty computation? That's going to happen at the time of infringement, not at the time years later when it's incorporated into a standard, right? Well, the timing of infringement in this instance was well after it was incorporated into the standard. But at least we're on – it's clear that we're looking at the time of infringement, right? Agreed. Yes, that's this court's well-established precedent. And there's no ex ante value here? Well, no, we need to parse that question a little bit. Are you asking me just because it's in the standard should you get more because people need to practice it, which Apple keeps characterizing as hold-up value? No, and there's no hold-up value. Well, Judge Posner said, did he not? I mean, his view was different, right? He said you look at it before, at the time just before they got the standard. That's correct. And that's how you calculate it. And you disagree with that. Absolutely, because that's inconsistent with this court's precedent because you need – you're looking at the time of first infringement. In other words, when the defendant, the accused, needs to come in and have a hypothetical negotiation and take a license. So the fact that it's in the standard and this was in some of the amicus briefs was recognized, that reflects that there's value in the technology. In fairness, whether you do it before or after, you would agree, would you not, that in order to avoid this kind of hold-up value, that you consider whether or not there's been an enhancement of value as opposed to it being in the standard and that that ought not to be included in the analysis. No, I understand. Right, I understand what you're saying. But you still – the fact that it's still in the standard, these standards are revised all the time, you have all of the industry, many of the industry participants. This is going into your rebuttal time now. Okay, then I will – I'll pause right there. You have your rebuttal, most of it. And Mr. Rosenkranz, we give you your full five minutes of rebuttal. It was put into the time that Mr. Nelson had. Thank you, Your Honor. So let me start with the Frand injunction. I want to return to this unwilling licensee concept. But could you also touch on briefly the point we were discussing with Mr. Nelson at the end? Yes, of course, of course. So there is nothing to send back to the district court because there is nothing to decide on unwilling licensee. I just want to be clear that Motorola's position about unwilling licensee was not about what we were talking about, will Apple eventually pay a royalty if one is awarded. Motorola's position is that our behavior before litigation has made us an unwilling licensee. And that is a very – that therefore entitles Motorola to an injunction prospectively to protect it. Now, that is a very, very mischievous concept. It's certainly not supported by the record here. And your view is that that's not one that Judge Posner embraced when he was talking about unwilling. No, no. In the FTC's brief, I think correctly reads Judge Posner as saying that Apple – this is a note – I put note 8 in the FTC's brief – that Apple was not an unwilling licensee, not in any relevant sense of the word. I mean, unless we – unless this court wants every case to devolve into a case that is about prior behavior, this court needs to put a stop to this notion that prior behavior before litigation occurred entitles someone to an injunction. What Apple did was nowhere near unreasonable, even if there were such a standard. Motorola was charging a rate that was 12 times what Apple was paying at the time for the pass-through for the license that it was using when it came out with the iPhone. Now, Judge Posner says he takes evaluation from not the time of infringement, but from right before they got the standard set up, right? So now we're talking about the damages. And if I may say just one more thing about the injunction, and then I'll turn to the damages. I was just saying there's no evidence on this record of unreasonableness. If you want to look at anything, look at Judge Robart's opinion saying that Motorola's rate, that the same rate that he applied here was 100 times what was reasonable. But if this court does remand, I just urge the court to remand with a standard. And the standard has to be, in order to prove that someone is an unwilling licensee in the relevant sense for irreparable harm, the unwilling licensee has to be someone who's been adjudicated to have infringed and then either cannot or will not pay the royalties. Now, Your Honor, to your question about holdout value. So we all agree that a holdout value should be eliminated from the damages calculation. We're just disagreeing about whose burden it is to figure it out. I do think Judge Posner was a little bit too aggressive in saying holdout value has to be calculated based upon a time earlier than the actual infringement. I don't care when. Right, because it's a little troubling that we have a whole different set of rules with respect to calculating one patent case versus another. That's right. All we're saying is holdout value, the value of the standard as opposed to the patent, has to be adjusted for. The other set of rules that this court has always applied is that – Even if it's your burden. So you're saying it could be your burden and not their burden. Well, I'm saying it is their burden. To demonstrate that the elephant in the room doesn't exist, even in the lost profits context where it would be our burden to show the substitutes, the patentee has to say that there's no reasonable possibility of any other value that needs to be accounted for. Here we're talking about other alternatives. There were clearly alternatives. Let's talk about the 898. There were two alternatives. They were equally good. There was nothing in particular. In fact, the expert found there was no particular value. That is, the judge is expert. No particular value to the differential. And so it is incumbent upon the expert to at least assess alternatives. Her analysis was there were no alternatives. Why? Because the standard made it essential. That necessarily means that she is reading into her damages calculation the holdup value and ignoring all the alternatives because the alternatives can't exist. What she should have done is to say, pretend the standard didn't exist, then would there be reasonable alternatives. I see my time is up. I need to hold you to this time. Yes. We're in the Seventh Circuit. I'm correct, am I not, that if there would be a reversal, this would have to go to a different trial judge? I believe that would be an appropriate remedy. Well, that's the Seventh Circuit's rule, not ours. Isn't that correct? I think that's correct. I'm just confirming that. Yes. Thank you. Thank you, Your Honor. Mr. Nelson, you have two minutes and 49 seconds. Thank you, Your Honor. So with respect to the 263 and in the District Court's opinion, you asked me whether there was any discussion of Mr. Knapper and the adequacy of Mr. Polish's or Dr. Polish's opinion. That's at A126 of the record. It's page 4 of the Daugherty opinion. It's the paragraph right in the middle of the page. With respect to this idea of an unwilling licensee, what Apple is proposing is a rule that says, well, once there's been an adjudication and they don't pay, that's the only time. But that isn't – the remedy there is some type of enforcement action. There's already been an adjudication. On this record, we submitted this as supplemental authority because it happened after Judge Posner's opinion. Apple actually, in the Western District of Wisconsin case before Judge Kraft, which is going to be on appeal in this court, we believe, actually refused. It was asked that question directly. If I set a rate, when will that take care of it? In other words, will that be the fran rate that's owed? And Apple said, not if we don't like it. So Apple has already expressed to a court that even if this is adjudicated and we don't like it. So the problem that we have with having a blanket rule is the basis – I would read their statement as just that there's going to be a negotiation. Isn't that what they're saying? That there would be a negotiation. Understood. But to have a hard and fast rule that with respect to standards patents you can't get injunctioned. One, under eBay, it says let's avoid broad rules. Let's look at the individual facts of the case and apply the particular facts. But there is one fact that is inherent in all of the fran cases we have, which is that in order to join, they've agreed to be willing to licensee. Right, but let's just take this. One of the things that they've agreed, though, is that there's willing licensees. In other words, sit there and negotiate in good faith. Not hold off, not have serial litigation, which is bad for the courts, bad for the public. Let's litigate these patents one at a time and pay on these patents one at a time. But what they're doing, too, when you make – Motorola in the record is over $1.5 billion a year in R&D in this area and has been for a long time developing this technology along with a number of other companies. So now what you bargained for is that people would come in and pay you that fran royalty, part of which could be used in your own R&D to further your own products, develop your own products. If somebody's holding out, then not only are you not getting that money so that you can develop those products, but they're getting to put that money and compete with you. So that's where there is a very real situation of a ripple of harm. Thank you, Mr. Nelson. We've reached the end. I'd like to thank both Mr. Rosenkranz and Mr. Nelson. We leaned on you a little bit more than we usually do, and you helped us, I think. I thank you.